Wanamaker, J.,
dissenting. The sole question involved in this case is the constitutionality of Section 12943, General Code, which reads as follows:
“Whoever, being a member of a firm, or agent, officer or employe of a company, corporation or *132 person, prevents employes from forming, joining or belonging to a lawful labor organization, or coerces or attempts to coerce employes by discharging or threatening to discharge them from their employ, ór the employ of a firm, company or corporation because of their connection with such labor organization, shall be fined not more than one hundred dollars or imprisoned not more than six months, or both.”
In a very recent case decided by the supreme court of the United States, January 25, 1915, entitled Coppage v. State of Kansas, 236 U. S., 1, a similar statute was before said court for review.
Section 1 of the Kansas statute reads as follows:
“That it shall be unlawful for any individual or member of any firm, or an agent, officer or employe of any company or corporation, to coerce, require, demand or influence any person or persons to enter into any agreement, either written or verbal, not to join or become or remain a member of any labor organization or association, as a condition of such person or persons securing employment, or continuing in the employment of such individual, firm, or corporation.”
It will be observed that, in all essentials, the acts prohibited by the Kansas statute are identical with the acts prohibited by the Ohio statute.
Judge Pitney, five of the supreme judges concurring with him, held that the Kansas statute was unconstitutional in that it violated the liberty of contract guaranteed by the 14th Amendment of .the Federal Constitution, which amendment reads as follows: .
*133 “All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of^ the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.”
Justices Day, Holmes and Hughes dissented from that judgment.
The majority of this court are content to follow the decision of the supreme court of the United States as controlling in the case at bar, and it must be frankly admitted that if the decision is right in the Kansas case it must also be the law in the case at bar.
With all due respect I deny the soundness of that decision, because I believe it to be unsupported by reason, contrary to logic, against the “equal protection of the law,'” out of joint with the spirit of our American institutions, and especially because I believe the statute in question is in perfect harmony with the 14th Amendment of the Federal Constitution.
Owing to this very radical difference, it is becoming to set forth the grounds upon which this dissent is based.
This is a criminal statute prohibiting certain acts and penalizing the commission of those acts.
- Such a statute, to be void because of unconstitutionality, must prohibit something which the con *134 stitution permits or protects. If the thing prohibited by the statute is not permitted or protected by the constitution, either in express terms or by clear implication, then the statute is not void because of unconstitutionality.
In brief, a statute cannot prohibit what the constitution protects or permits. Neither can a statute permit or protect what the constitution prohibits. Such a conflict is so obvious and clear that all must be agreed that the statutory provision must fall in order that the constitutional provision shall prevail.
This test is simple, short and sound, and when applied to constitutional questions brings about a correct conclusion.
Let us now examine the statute; boil it down and paraphrase it into its elements. It would then read in substance:
“Any employer who coerces his employe in order to prevent him from belonging to a lawful labor organization shall be fined,” etc.
Now, the gist and gravaman of the act prohibited by said statute is “coercion;” coercion by an employer upon his employe with reference to the employe’s membership in a lawful labor organization.
Mr. Justice Pitney, speaking for the supreme court of the United States in Coppage v. State of Kansas, supra, introduces his opinion with the following language:
“At the outset, a few words should be said respecting the construction' of the act. It uses the term ‘coerce,’ and some stress is laid upon this in *135 the opinion of the Kansas supreme court. But, on this record, we have nothing to do with any question of actual or implied coercion or duress, such as might overcome the will of the employe by means unlawful without the act. In the case before us, the state court treated the term 'coerce’ as applying to the mere insistence by the employer, or its agent, upon its right to prescribe terms upon which alone it would consent to a continuance of the relationship of employer and employe. In this sense we must understand the statute to have been construed by the court, for in this sense it was enforced in the present case; there being no finding, nor any evidence to support a finding, that plaintiff in error was guilty in any other sense. * * * The evidence shows that it would have been to the advantage of Hedges, from a pecuniary point of view and otherwise, to have been permitted to retain his membership in the union, and at the same time to remain in the employ of the railway company. In particular, it- shows (although no reference is made to this in the opinion of the court) that as a member of the union he was entitled to benefits in the nature of insurance to the amount of fifteen hundred dollars, which he would have been obliged to forego if he had ceased to be a member. But, aside from this matter of pecuniary interest, there is nothing to show that Hedges was subjected to the least pressure or influence, or that he was not a free agent, in all respects competent, and at liberty- to choose what was best from the standpoint of his own interests. Of course, if plaintiff in error, acting as the repre *136 sentative of the railway company, was otherwise within his legal rights in insisting that Hedges should elect whether to remain in the employ of the company or to retain his membership in the union, that insistence is not rendered unlawful by the fact that the choice involved a pecuniary sacrifice to Hedges. * * * And if the right that plaintiff in error exercised is founded upon a constitutional basis it cannot be impaired by merely applying to its exercise the term ‘coercion.’ ”
Courts have no right to construe that which needs no construction. The language of the statute is simple, plain and free from doubt. It is its own interpreter. To. permit a court to construe such a statute would be to vest it with power to legislate by striking out certain words or by adding certain words.
It is intensely interesting to observe from the above quotation the strained and ingenuous effort of the court to expunge or eliminate. from the statute the word “coerce,” or at least if not to expunge the word to expunge the gist and teeth of the word so as to make it speak kindness, gentleness, voluntariness, and to breathe the spirit of liberty.
By what legal legerdemain may a court make the word “coerce” consistent with liberty?
To coerce is not to coerce. That is the false premise with which the court starts, and it is unavoidable that, reasoning upon this false premise, the court should reach a fallacious conclusion.
It is immaterial for the consideration of any case under the statute whether the form of coercion *137 is mild or severe. The test must be made under the most atrocious case, as well as the most trifling.
The mere fact that a case is not proven under the statute does not affect the constitutionality of the statute, and the labored effort in the first part of the opinion to mollify the facts of the Coppage case is wholly foreign to the question of the constitutionality of the statute.
What did the lawmakers mean when they used the word “coerce?” Webster’s International Dictionary defines “coerce” as follows:
“To compel or constrain to any action; as, to coerce a man to vote for a certain candidate.
“Coerce had at first only the negative sense of checking or restraining by force; as, to coerce a bad man by punishments or a prisoner with fetters. It has now gained a positive sense, viz., that of driving a person into the performance of some act which is required of him by another; as, to coerce a man to sign a contract; to coerce obedience. In this sense (which is now the prevailing one), coerce differs but little from compel, and yet there is a distinction between them. Coercion is usually accomplished by indirect means, as threats and intimidation, physical force being more rarely employed in coercing.”
If we may restore the word “coerce” to the statute, as the legislature enacted it, embracing its most atrocious, as well as its mildest form (for courts have no right to make laws or to make constitutions), let us proceed to apply the foregoing constitutional test,
*138 The statute prohibits coercion by the employer upon the employe in reference to the latter’s lawful labor organization. If such prohibition by the statute is unconstitutional it must be because the constitution clearly permits or protects such coercion.
Does anybody believe it? Was it the purpose of the 14th Amendment to protect coercion or to prevent coercion?
The 13th Amendment to the Federal Constitution was adopted in 1865. Its purpose and scope are reasonably clear, to-wit, to abolish slavery or involuntary servitude, to fully emancipate the colored population of the nation.
Slavery, as defined by Webster, is “The state of entire subjection of one person to the will of another.”
It soon became quite evident to the congress of the United States and the legislatures of the several states that notwithstanding the 13 th Amendment abolished slavery, the states might still, by a policy of hostile or unfriendly legislation, subject the colored race to many of their infirmities under slavery, and, therefore, the 14th Amendment was adopted in 1868, in order to provide and protect against any such unfair and unjust state legislation as might “deprive any person of life, liberty or property without due process of law,” or “deny to any person within its jurisdiction the equal protection of the laws.”
If it had not been for the provisions of this 14th Amendment the 13th Amendment would have been merely so many high-sounding words on liberty.
*139 While the 13th Amendment abolished the “entire subjection of one person to the will of another,” it was the paramount purpose of the 14th Amendment to prevent any partial “subjection of one person to the will of another” by state enactments.
How can it be claimed seriously that there is lodged anywhere in this 14th Amendment any authority or power to permit or protect any subjection of one person, such as an employe, to the will of another, such as an employer?
In short, the whole spirit and purpose of the amendment is to prevent “subjection,” “coercion,” intimidation and the like, in any degree or in any form whatsoever.
If this constitutional test be sound, it would seem-to bring about a conclusion of the whole matter in favor of the constitutionality of the statute. Otherwise, you have this absurdity, that “liberty of contract” on the part of the employer gives him “liberty to coerce” as against the employe — a monstrous doctrine in any land of liberty.
Instead of a clear conflict, therefore, between the state statute and the 14th Amendment, it conclusively appears that there is a clear concord and that the statute was but a carrying out of the great purposes of anticoercion and antisubjection, provided for in the 14th Amendment.
This would seem to be the undoubted end of this whole controversy and all else would be superfluous, but there are other observations pertinent to the majority opinion that might profitably be made.
A careful reading of the opinion of the supreme • court in the Coppage case discloses a strange and *140 significant omission. The last clause of the 14th Amendment contains this language: “Nor deny to any person within its jurisdiction the equal protection of the laws.” This is as much a part of the amendment as the so-called “liberty of contract,” and each doubtless was intended to throw light upon the other; each was intended to be explanatory and consistent with the other. Throughout the opinion, however, there is no discussion of this phase of the amendment.
The judgment of the supreme court of the United States in the Coppage case is made to hang on the peg “liberty of contract.”
This “liberty of contract” theory has been severely overworked by our courts. It has become decidedly threadbare. Every time a state or federal legislature has undertaken to exercise the police power in preventing gross abuses that jeopardize life, liberty, health and public safety generally, every mercenary interest affected thereby has claimed that its liberty of contract was being violated. This theory has been invoked to protect almost every infamy that can be put into the form of a contract, and it has chiefly grown up by reason of the favor extended to it by our courts under the mistaken view of the 14th Amendment. The colored man’s rights, which were supposed to be the primary consideration of this amendment, have been lost sight of, and the “soulless” corporations seem to have been the chief beneficiaries.
It may not be amiss in this opinion to give a few of the primary considerations that ought to *141 prevail in considering this liberty of contract as applied between employer and employe.
One man’s liberty ends where another man’s liberty begins. It is absurd to say that one man shall have the liberty to deny to another man equal liberty. The distinction must all the while be made that the liberty of contract of one man must not extend so far as to interfere or prevent the equal liberty of contract of the other man, else we have not the equal protection of the law guaranteed by this same 14th Amendment; at least no man’s liberty to contract should be extended so far as to mean his liberty to coerce some other man into.a contract.
Now, what is this liberty of contract, guaranteed to the employer by the constitution, which is abridged or denied'to him by the statute?
Under the statute he may still employ whom he will, when he will and at any wage he will. He may discharge whom he will, when he will and for any reason he will, or for no reason at all; and in these respects his powers are the same after the enactment of the statute as they were before the enactment of the statute. What the employer is demanding, however, is the right to abridge the employe’s liberty of contract, to deny to the employe the right to contract with his fellows by forming and organizing a lawful labor union, and to deny the employe’s right to contract with the union as a member thereof, while he, the employer, enjoys membership in all sorts of business and industrial associations, presumably to his lawful benefit.
*142 Organization is the keynote of the age. This is true not only in educational, religious and benevolent lines, but especially is it true in every kind and branch of business. Formerly the individual man did the business of the country. Today he does about as much business as the individual dollar does. The individual man has given way, first to the simple partnership, then to the joint-stock company, corporation, holding company, syndicates and the like, all of which have brought about a condition in the business world that has practically eliminated the individual man in individual business and substituted therefor a manager or superintendent, or other officer or agent, with a board of directors, stockholders and millions of capital and credit back of him.
This being the situation as to capital and business, the workingman years ago began to realize his weakness, inequality and dependence in contracting with the employer for his labor.
As was said by the supreme court of Kansas in considering the Coppage case:
“It is a matter of common knowledge, of which legislatures and courts should take cognizance, that many individual laborers are unable to cope on an equal footing with wealthy individual or corporate employers as to the terms of employment; also that both employers and employes are in fact separately associated in organizations for the purpose of advancing their respective and, in certain respects, conflicting interests. It goes without saying that the individual employe can not coerce his emplo}^er from remaining a member of *143 his association and that the individual employer may so coerce his employe unless restrained therefrom by law. * * * the individual employe is, in the supposed case, pitted not only against his employer in contracting the conditions of employment, but also against the aggregation of associated employers. That such a condition, if real, tends to reduce employes to mere serfdom can not be questioned.”
The truth is that the individual workman today, seeking employment in the large corporate industrial and transportation plants, enjoys no such thing as liberty of contract. He enjoys it in law, but not in fact.
The workingman, recognizing the large benefits that have accrued to capital and business by corporate organization, joined his fellow workmen together in a so-called labor union for the purpose of protecting and improving the wages, hours of labor, sanitary conditions, protection against loss of life, limb, etc., and, in a general way, securing practical betterment of working conditions. The workingman claimed for himself the clear benefits of the law, and now demands for the preservation of those benefits the “equal protection of the law.” Shall it be denied him? Shall labor and capital be placed on an equal footing before the law and by the law as to the right to organize if they see fit so to do?
Labor unions, lodges and associations, no matter under what name, are outlaws today under the Coppage case, unless they have the consent of the employer. What I mean is that any employer, by *144 the exercise of his power under the so-called right of liberty of contract, may dissolve and destroy any labor union by the withholding of employment by discharging by coercion those who now are, or hereafter may become, members of such lawful labor organization.
The employer is to have the right to organize without the consent of his workmen, but the workmen are not to enjoy the same right of organization unless they secure the consent of the employer. Is that equal protection of the law?
Abraham Lincoln once said something about capital and labor, and it may not be amiss to quote him. In his message to congress, of December 3, 1861, he wrote these immortal words:
“Labor is prior to, and independent of, capital. Capital is only the fruit of labor, and could never have existed if labor had not first existed. Labor is the superior of capital, and deserves much the higher consideration. Capital has its rights, which are as worthy of protection as any other rights. Nor is it denied that there is, and probably always will be, a relation between labor and capital producing mutual benefits.”
But granting, for the purpose of this argument, that labor is not superior to capital, it certainly should be conceded that before the law it is the equal of capital.
In his first message of July 4, 1861, he refers also to the leading object of government, of which the judiciary is but a part, the same as are the legislative branch and the executive branch:
“This is essentially a people’s contest * * *. *145 It is a struggle for maintaining in the world that form and substance of government whose leading object is to elevate the condition of men — to lift artificial weights from all shoulders; to clear the paths of laudable pursuit for all; to afford all an unfettered start, and a fair chance in the race of life. Yielding to partial and temporary departures, from necessity, this is the leading object of the government for whose existence we contend.”
If the “leading object” in all government “is to elevate the condition of men — to lift artificial weights from all shoulders; to clear the paths of laudable pursuit for all; to afford all an unfettered start, and a fair chance in the race of life,” why should the right of organization, the right of' mutual association, exchange of ideas* among those engaged .in the same line of employment, consideration and discussion of improved conditions for labor, why should these things be denied to the workingmen ?
Why should capital and business, the stronger and more independent, be allowed the privilege of organization, which it certainly should enjoy, and then deny to labor, the weaker and more dependent, the equal right of organization? Is not such clearly a violation of the provision of the 14th Amendment providing for “equal protection of the laws ?”
Now it must be remembered that the statute uses the words “any lawful labor organization.” Of course if it be unlawful it should be treated as the common enemy. But the language of the *146 statute is so broad that it comprehends not only an international organization, state organization, district, county or municipal organization, but also includes an organization of the workingmen, limited in its membership to a single factory, and if the doctrine of the Coppage case shall prevail as the law, workingmen in such single factory have no right to organize for their mutual benefit if the employer objects.
Now,, it is conceded on all sides, both in the majority and minority opinions in said Coppage case, that the 14th Amendment does not in anywise limit the police power of the several states as enjoyed and exercised prior to the adoption of the 14th Amendment, providing always that such power shall not be exercised arbitrarily and capriciously, and Justice Pitney, speaking for the majority, uses this language:
“We do not mean to say, therefore, that a state may not properly exert its police power to prevent coercion on the part of employers towards employes, or vice versa.”
But the majority opinion most clearly holds that in enacting the Kansas statute the legislature acted arbitrarily and capriciously and without any reference to public health, safety, morals or general welfare. This appears from the opinion as follows :
“Laying aside, therefore, as immaterial for present purposes, so much of the statute as indicates a purpose to repress coercive practices, what possible relation has the residue of the act to the public health, safety, morals or general welfare? *147 None is suggested, and we are unable to conceive of any.”
Of course, laying aside the “criminal act” of coercion, there is practically nothing left of the statute. The court would have an equal right to cut the word “kill” out of a murder statute. The majority of the supreme court of the United States are as seriously disturbed throughout the opinion by this word “coercion” as the distinguished character in Macbeth was constantly disturbed by Banquo’s ghost. It simply won’t down.
As an answer to the question, “What possible relation has the statute to the public health, safety, morals or general welfare?” let me suggest the following:
Too many judges know as men what they refuse to know as judges. It is a matter of common knowledge, of which all courts should take judicial ' notice, that there are constant conflicts in some sections of the industrial world between capital and labor; no matter what the cause, whether it be bad leadership and advice on the part of labor, or bad leadership and advice on the part of capital, or both. Those conflicts are of such frequent occurrence and at times so serious in their nature as to shake the very foundation of popular government. We cannot forget the Homestead strike of 1892; the Chicago railroad strike of 1894; the great anthracite coal strike of 1902; the Colorado Fuel and Iron strike of 1914, and many others which might be named, showing how the stability and security of the very foundations of government are seriously menaced.
*148 Can it be said that a state legislature, having these industrial conditions in mind, might not legislate in a manner to reduce or minimize the conflict between capital organized on the one side and labor organized on the other by denying to either the right to destroy the other? Indeed, what can be more important than domestic peace and safety?
The Fathers so recognized it in the preamble of the federal constitution, in which they announced that one of the great purposes of government was “to insure domestic tranquility,” and evidently the legislature of Kansas, as well as that of Ohio, whose motives cannot be questioned in the enactment of this legislation, may have their acts fairly reconciled with this high purpose of preserving domestic tranquility by preventing the exercise of coercion by the employer upon the employe.
Suppose the legislature of Kansas, or of Ohio, had passed an act providing that “no employer by himself or his agent shall coerce any of his employes into voting any ticket, or for any officer, he desires to vote for,” or “that no employer by himself or his agent shall coerce any employe into joining or attending any church or lodge,” or providing that “no employer by himself or his agent shall coerce any employe into buying at the company’s store,” would it be seriously contended that such statutes were in violation of the liberty of contract, even as construed by those courts that have seemed more eager to protect property rights than personal rights?
■ Again, the opinion says:
“Can it be doubted that a labor organization— *149 a voluntary association of workingmen — has the inherent and constitutional right to deny membership to any man who will not agree that during such membership he will not accept or retain employment in company with non-union men? Or that a union man has the constitutional right to decline proffered employment unless the employer will agree not to employ any non-union man? (In all cases we refer, of course, to agreements made voluntarily, and without coercion or duress as between the parties * * *.)”
Again we see the insidious and strained effort to’get away from the “coercion” of the statute.
The illustration is not apropos or analogous. In . order to be so you must add the element of coercion. You would then have an instance of where an employe was using coercion to induce a nonunion man to join the labor union or to quit the employment. You would then have the same coercion by employe as is prohibited by the statute to the employer. Coercion upon the part of one should be as unlawful as coercion upon the part of the other.
This coercion is in the nature of a secondary boycott. Employers for years have sought, and finally obtained, the support of courts in enjoining what is known as the “secondary boycott” upon business. In effect, this is a “secondary boycott” upon labor, for it is directed not against the individual employe but against the labor union.
This opinion goes much further, and is much more drastic, than anything heretofore pronounced by a court or even demanded by the National Association of Manufacturers, of which John Kirby, *150 Jr., is president, as appears from their fundamental principles touching labor unions. These planks are as follows :
“1. Fair dealing is the fundamental and basic principle upon which relations between employes and employers should rest.
“2. The National Association of Manufacturers is not opposed to organizations of labor as such, but it is unalterably opposed to boycotts, black lists and other illegal acts of interference with the personal liberty of employer or employe.
“3. No person should be refused employment or in any way discriminated against on account of membership or nonmembership in any labor organization and there should be no discrimination against or interference with any employe who is not a member of a labor organization by members of such organization.”
There is a substantial and well-grounded public opinion that courts of last resort, and particularly the federal courts, are too eager to nullify remedial and regulatory legislation enacted by state legislatures under their police power in the interest of the public peace, safety, life, limb, health and morals. The law is not a mummy nor a straight jacket. It is presumably a live, elastic thing, adjusting- itself to the changed and changing conditions of our social, political, industrial and commercial life. It must of necessity, therefore, be a growth, an evolution, keeping pace with the advancement of our twentieth-century civilization.
This attitude of our courts, toward the legisla *151 tive exercise of police power by the states, in matters that are purely state affairs, has caused a substantial loss of public confidence in courts that is too patent to be denied. While courts are unanimous in holding that such statutes should not be declared unconstitutional unless there is an “obvious repugnance” between the statute and the constitution, or unless the statute is unconstitutional “beyond all reasonable doubt,” yet an analysis of too many decisions of our courts would seem to indicate that the statute was declared unconstitutional, not upon such clear conflict, but upon some whim, caprice, prejudice or predilection of the court rather than by sound reason or the laws of logic.
The decision in the Coppage case is peculiarly unfortunate, not only because it nullifies the Kansas statute and the Ohio statute, but because in a large number of other states similar statutes that have been in force for years are also nullified.
Millions of workingmen and working women, and even working children, not only those who are now members of some labor organization, local, state or national, but those who may hereafter desire to become such, are all most intimately, seriously and prejudicially affected by this decision.
In the hope that the law made by the supreme court of the United States in this case may not become the fixed and settled policy of our courts, but that the same may in due course be reversed and labor be given its equal rights with capital, this dissenting opinion is respectfully submitted.
It would be impossible to endorse too favorably *152 the very able dissenting opinions of Justices Day, Holmes and Hughes.